[No. 32376.   Department Two.   October 30, 1953.]

EARL S. TRUMBLE *et al., Appellants,* v. LOUIS WASMER *et al., Respondents.*[1]

[1] Reported in 262 P. (2d) 538.

*Del Cary Smith* and *Dressel & Lehan,* for appellants.

*Witherspoon, Witherspoon & Kelley,* for respondents.

DONWORTH, J.—Plaintiffs consolidated three separate causes of action founded in *quantum meruit* and instituted this suit to recover the reasonable value of their services, over and above their fixed annual salaries (each of which was less than $5,000 per year) for the period from October, 1942, through December, 1945. Plaintiffs have appealed from a judgment on the pleadings dismissing their consolidated actions.

For the purposes of this appeal, respondent Louis Wasmer will be referred to as though he were the only respondent.

In order to review the trial court's judgment, it is necessary to set forth in substance the facts as finally alleged in the pleadings so that we may determine whether or not the dismissal of this suit was proper.

Appellants' amended complaint alleged that respondent at all times involved in this action was the owner of radio station KGA in Spokane, Washington, which he had leased to Louis Wasmer, Inc.; that radio station KHQ in the same city was owned and operated by Louis Wasmer, Inc.; that all the stock of the corporation, save qualifying shares, was owned by respondent, who was also the president and general manager of the corporation.

The amended complaint further alleged that appellants constituted the advertising and sales staffs for both stations, that on or about a day following the effective date of executive order No. 9250 (promulgated pursuant to the provisions of the wage stabilization act on October 3, 1942), respondent stated to appellants that he regretted not having increased their salaries sooner, that he realized their salaries were below those paid employees in similar capacities in other stations, but that in view of the executive order he was unable to make any substantial changes in their salaries. However, it was alleged, he then promised to make proper

and adequate adjustment of their salaries after the termination of the emergency to compensate each of appellants for their services rendered during that period if they would show their loyalty by remaining in their positions and by continuing their services during the emergency.

Appellants alleged that they stayed in their same employment in reliance upon this promise, which was repeated in early 1943 just before respondent left for military service, again in April, 1945, following his return therefrom and many times thereafter.

In March, 1946, station KHQ was sold by respondent, and appellants continued to work for station KGA until it was sold in September, 1949.

It was further alleged that in December, 1946, respondent adjusted their salaries for the year 1946 and stated that a salary adjustment for the years in question would be taken care of later; that, following the sale of KGA, he asked each of appellants to submit a statement of his claim for adjustment, but he neither offered nor tendered any payment after each had done so. It was alleged that these actions and promises by respondent constituted a ratification and reaffirmance of his original promise to pay, made about October 4, 1942, and it was not until October 30, 1950, that further consultations failed and respondent definitely indicated that he would not honor appellants' claims.

The amended complaint also alleged that the aforesaid promises were made by respondent not as an officer of Louis Wasmer, Inc., but in his individual capacity to secure benefits as they would be reflected in the income derived through the sole ownership of the stock of Louis Wasmer, Inc., and through the benefits that would accrue to him by virtue of his lease of station KGA to the corporation; and that, in making the aforesaid promises, he was not acting as an "employer" as that term was defined in the wage stabilization act, executive order No. 9250, or any rule or regulation enacted pursuant to the powers therein granted. The amended complaint concluded with a prayer asking judgment for specified amounts over and above salaries received by appellants.

Respondent interposed a demurrer to the amended complaint on all statutory grounds. The demurrer was overruled. Respondent then filed an answer in which he made certain admissions and denials of these allegations and, by way of affirmative defense (following an order granting appellants' motion to strike certain legal conclusions), stated that such an agreement would be contrary to the wage stabilization act and executive order No. 9250, which required approval of the salary stabilization unit for all salary increases, forbade payment of such increases without prior approval, and prohibited promises of additional payments payable if and when salary controls were lifted. In paragraph two of his first affirmative defense, respondent set forth excerpts from certain of the regulations promulgated by the economic stabilization director and the commissioner of internal revenue which allegedly rendered the agreement illegal.

By way of a second affirmative defense, respondent alleged that appellants' causes of action did not accrue within three years before the commencement of this action and were barred by the statute of limitations. (RCW 4.16.080.)

In reply to respondent's first affirmative defense, appellants admitted the enactment of the wage stabilization act and the issuance of executive order No. 9250, but denied that they prohibited such an agreement to pay additional wages at such time as wage restrictions should be lifted, and further alleged that they had no application to respondent's promise for the reason that, at the time he made the promise, he was not acting as an "employer" as therein defined. It was further alleged that none of the rules or regulations set forth in paragraph two of the first affirmative defense rendered the agreement illegal or void.

In reply to the second affirmative defense, appellants denied that the action was barred by the statute of limitations.

On this state of the pleadings, the trial court awarded judgment for respondent and dismissed the suit.

It should first be noted that this court has previously held in a similar case that the motion for judgment on the

pleadings does not properly raise the issue of the bar of the statute of limitations. *Eastern Outfitting Co. v. Lamb,* 169 Wash. 480, 14 P. (2d) 30. In determining whether or not appellants' pleadings were legally sufficient to withstand respondent's motion for judgment on the pleadings, the questions as to the running of the statute of limitations and the legal effect of a subsequent ratification or reaffirmance of the original promise are not now before us.

The party moving for judgment on the pleadings admits, for the purpose of the motion, the truth of every fact well pleaded by his opponent and the untruth of his own allegations which have been denied. *Miller v. Paul,* 155 Wash. 193, 283 Pac. 699; *Yakima Hardware Co. v. Strickler,* 156 Wash. 369, 286 Pac. 853; *State ex rel. Department of Public Works v. Skagit River Nav. & Trading Co.,* 181 Wash. 642, 45 P. (2d) 27; *Pearson v. Aluminum Co. of America,* 23 Wn. (2d) 403, 161 P. (2d) 169. However, a motion for judgment on the pleadings admits only facts well pleaded and not mere conclusions or the pleader's interpretation of statutes involved or his construction of the subject matter. 71 C. J. S. 868, Pleading, § 426; *Miller v. Paul, supra.*

Applying these tests to the pleadings before us we must accept all but two of the allegations of appellants' pleadings as the facts of this case. Appellants' unsupported allegation that, at the time he made the original promise, respondent was not acting as an officer of Louis Wasmer, Inc., but in his individual capacity, is not the pleading of an ultimate fact but is a mere conclusion. This is especially true in light of the prior allegation that, at all times mentioned, respondent was president and general manager of the corporation. The further allegations in the amended complaint and the reply to the effect that, in making aforesaid promise, respondent was not acting as an "employer" as that term is defined in the wage stabilization act, executive order No. 9250, or any rule or regulation enacted pursuant to the powers therein granted, involves an interpretation of the applicable statute and cannot be considered as an admitted fact on this appeal.

Nevertheless, on the basis of the allegations of fact which have been well pleaded, we are of the opinion that appellants have stated a cause of action, and that the trial court erred in granting respondent judgment on the pleadings.

■ It is alleged, and admitted for the purpose of this appeal, that respondent's original promise was made on or about a day following the effective date of executive order No. 9250. That order was effective October 3, 1942, so we must accept as true the allegation that the promise was made on or about October 4, 1942, and apply the pertinent law as it existed at that time. Whether the salary agreement was illegal or not must be determined under the law as it existed when the agreement was made. *In re Pringle Engineering & Mfg. Co.*, 164 F. (2d) 299; *Morford v. Bellanca Aircraft Corp.*, 45 Del. 129, 67 A. (2d) 542.

In the absence of any statutory prohibition, an agreement by an employer to increase the salaries of his employees is legal and enforcible. Respondent contends that the agreement in this case was made after the wage stabilization act of October 2, 1942, and during the period of wage and price control and was thereby rendered illegal and void.

The wage stabilization act of 1942 (50 (War, Apx.) U. S. C. § 961, U. S. C. Cong. Ser. 1942, pp. 1202-1205) provided that:

"In order to aid in the effective prosecution of the war, the President is authorized and directed, on or before November 1, 1942, *to issue a general order stabilizing prices, wages, and salaries,* affecting the cost of living; and, except as otherwise provided in this Act, such stabilization shall so far as practicable be on the basis of the levels which existed on September 15, 1942. The President may, except as otherwise provided in this Act, thereafter provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities: . . .

"Sec. 2. The President may, from time to time, promulgate such regulations as may be necessary and proper to carry out any of the provisions of this Act; and may exercise any power or authority conferred upon him by this Act through such department, agency, or officer as he shall direct. . . .

598

"Sec. 5. (a) No employer shall pay, and no employee shall receive wages or salaries *in contravention of the regulations promulgated by the President* under this Act." (Italics ours.)

One day later, on October 3, 1942, the president, pursuant to the power vested in him by the wage stabilization act, promulgated executive order No. 9250. (U. S. C. Cong. Ser. 1942, pp. 1259-1262.)

Title I of the order established the office of economic stabilization with an economic stabilization director as its head. The director was given authority, subject to the approval of the president, to formulate and develop a comprehensive national economic policy relating to the control of civilian purchasing power, prices, wages, salaries, profits, rationing, subsidies and all related matters.

So much of Title II of the order as is pertinent read:

"1. *No increases in wage rates*, granted as a result of voluntary agreement, collective bargaining, conciliation, arbitration, or otherwise, and no decreases in wage rates, shall be authorized unless notice of such increases or decreases shall have been filed with the National War Labor Board, and unless the National War Labor Board has approved such increases or decreases.

"2. The National War Labor Board shall not approve any increase in the wage rates prevailing on September 15, 1942, unless such increase is necessary to correct maladjustments or inequalities, to eliminate substandards of living, to correct gross inequities, or to aid in the effective prosecution of the war.

"Provided, however, that where the National War Labor Board or the Price Administrator shall have reason to believe that a proposed wage increase will require a change in the price ceiling of the commodity or service involved, such proposed increase, if approved by the National War Labor Board, shall become effective only if also approved by the Director. . . .

"5. *No increases in salaries now in excess of $5,000 per year* (except in instances in which an individual has been assigned to more difficult or responsible work), shall be granted until otherwise determined by the Director." (Italics ours.)

It is particularly to be noted that no mention was made of increases in salaries of $5,000 or less.

Title III of the order provided in part:

"4. In order to effectuate the purposes and provisions of this Order and the Act of October 2, 1942, any wage or salary payment made in contravention thereof shall be disregarded by the Executive Departments and other governmental agencies in determining the costs or expenses of any employer for the purpose of any law or regulation, including the Emergency Price Control Act of 1942 or any maximum price regulation thereof, or for the purpose of calculating deductions under the Revenue Laws of the United States or for the purpose of determining costs or expenses under any contract made by or on behalf of the Government of the United States."

Title VI contained the general provisions of the order. Section 2 thereof defined the types of remuneration which were to be included within the terms "salaries" and "wages." The last sentence of the section then stated:

" 'Salaries' as used in this Order means remuneration for personal services regularly paid on a weekly, monthly or annual basis."

Thus it will be seen that, at the time the promise was alleged to have been made in this case, executive order No. 9250, promulgated under the authority of the wage stabilization act, effectively prohibited all increases in *wage* rates prevailing on September 15, 1942, unless approved by the national war labor board, prohibited increases in those salaries which on October 3, 1942, were *in excess of $5,000* per year unless approved by the director of the office of economic stabilization, but did not contain any provision relating to existing salaries of $5,000 or less.

It was alleged, and for the purpose of this appeal must be accepted as true, that all three appellants were earning annual salaries of less than $5,000 on October 4, 1942, when the original promise was made. Therefore, the alleged agreement was not prohibited or rendered illegal by any law or public policy then existing.

That this interpretation of the wage stabilization act and executive order No. 9250 in effect on October 4, 1942, is the

correct one, is further substantiated by the first set of regulations issued by the director of economic stabilization, effective October 27, 1942. (U. S. C. Cong. Ser., 1942, p. 1856.)

Section 4001.6 read:

"Salary increases. In the case of a *salary rate of $5,000 or less per annum existing on the date of the approval of these regulations [October 27, 1942] by the President* and in the case of a salary rate of more than $5,000 per annum existing on October 3, 1942, no increase shall be made by the employer except as provided in regulations, rulings, or orders promulgated under the authority of the regulations in this part. Except as herein provided, *any increase made after such respective dates shall be considered* in contravention of the Act and the regulations, rulings, or orders promulgated thereunder from the date of the payment if such increase is made prior to the approval of the Board or the Commissioner, as the case may be." (Italics ours.)

It is significant that those agreements for salary increases, made after the specified dates, were declared to be in contravention of the act, while similar agreements made prior to the controlling dates were not. Thus, on the date alleged in appellants' complaint there was no statute, order, or regulation in effect which rendered illegal this alleged agreement to increase the existing salaries of less than $5,000. The agreement, being valid when made, was binding upon and enforcible against respondent.

The executive orders and regulations requiring prior approval of all wage or salary increases were relaxed in 1945. See executive order No. 9599, 10 Fed. Reg. 10155; National War Labor Board General Orders, 10 Fed. Reg. 10424, § 803.40; Executive Order No. 9651, 10 Fed. Reg. 13487; Supplementary Wage & Salary Regulations of the Office of Stabilization Administrator and Office of War Mobilization and Reconversion, 10 Fed. Reg. 14820. The wage stabilization act of 1942 expired June 30, 1947, by the provisions of § 6 of the act, as amended.

None of the cases cited by the parties, or discovered by our independent research, involved a determination of the question presented here.

Appellants rely mainly on the case of *Nussenbaum v. Chambers & Chambers*, 322 Mass. 419, 77 N. E. (2d) 780. In that case, the parties, in the spring of 1945, entered into a one-year agreement to increase the employee's salary (then in excess of $5,000 per year). Both parties knew of the wage stabilization act, and there was evidence that the increase was not to take effect until official approval had been obtained. Before the date of payment arrived, the regulations had been relaxed, and approval of the increase was no longer necessary. The court found that at no material time was either the making of such a contract or the performance of it illegal, and affirmed a verdict for the employee.

Respondent relies upon the cases of *In re Pringle Engineering & Mfg. Co., supra*; *De La Rama Steamship Co. v. Pierson*, 174 F. (2d) 84; *Morford v. Bellanca Aircraft Corp., supra*, and others cited in his brief, to support his argument that any agreement for salary increases made in contravention of the terms of the act, or orders promulgated thereunder, was illegal and void *ab initio* and could not become enforcible after the termination of salary controls.

Those cases all involved salary increases agreed upon between employees and employers *after* October 27, 1942, and hold that such agreements were illegal under the *then existing* law. They, accordingly, are not controlling here.

For the above stated reasons, we believe that the alleged agreement as set forth in the pleadings was legal when made and enforcible upon its breach, regardless of the existence of salary controls or the termination thereof. It was, therefore, error for the trial court to grant respondent's motion for judgment on the pleadings and enter the judgment of dismissal.

When this case is tried on the merits, an entirely different situation may be found to exist, depending upon the evidence then presented. At present, we are passing only upon the allegations of the pleadings now before us, and nothing said in this decision with reference to the facts is in any way binding upon the court when the case comes on for trial.

The judgment is reversed, and the cause remanded for further proceedings consistent with the views expressed herein.

SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.

GRADY, C. J. (concurring in the result)—I concur in the result reached in the foregoing opinion, but do not subscribe to the view that the allegations in the pleadings that, at the time Wasmer made the original promise to appellants, he was not acting as an officer of the corporation but was acting in his individual capacity, and that, in making the promise referred to, Wasmer was not acting as an "employer" as that term is defined in the wage stabilization act, etc., were conclusions of the pleader and were not such allegations of fact as would be treated as true by a demurrer, or as admitted facts when considering a motion for judgment on the pleadings. Such statements are regarded as conclusions or those of ultimate facts, depending upon the way in which the words are used and the intent of the one using them. In order to express the thoughts to be conveyed in other than a direct manner, would require the use of many words and a circuitous process which would be objectionable upon the ground that evidence was being pleaded, which is one of the inhibitions expressed by authorities on pleading. If one desires to convey the idea that another acted not as an officer of a corporation, but in his individual capacity, or that he was not acting as an employer at a particular time or under particular circumstances, all he needs to do is to just say so, and no one will misunderstand what he means. This is what is meant by our statute which admonishes us to plead ultimate facts in plain and concise language.

Ever since code pleading was devised, many courts have been struggling with common-law concepts of pleading with much resultant confusion and conflict of viewpoint, and the effort to simplify pleading has often been in a measure thwarted. This is quite well demonstrated when one considers the question of what is or what is not a conclusion of the pleader, whether it be one of law or fact. A discourse

on the subject is found in 41 Am. Jur. 290, and 300, Pleading, §§ 6, 7, 8, 16 and following sections, and in 1 Bancroft's Code Pleading 90, § 43 *et seq.*

Many pleaders will set forth a series of statements and follow them with their conclusions therefrom. Not much trouble is found in condemning the conclusion part, although it may be of aid in informing a party what he has to meet. Often, however, the pleader may be accused of setting forth evidentiary matters instead of ultimate facts. The situation is sometimes met by requiring the question of proper pleading to be tested upon a motion to strike or to make more definite and certain, according to which form the pleader has adopted, but if this is not done, by holding the pleading good as to form if the objection is first made by demurrer or by motion for judgment on the pleadings.

---

February 19, 1954.   Petition for rehearing denied.

[1]Reported in 262 P. (2d) 530.